1
2
3
4
5
6

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

7
8
9
10

SHIRLEY BARTSCH, as the
administrator/personal representative
of the ESTATE OF ELVIS
WILSON, and SHIRLEY
BARTSCH as a parent of ELVIS
WILSON, pursuant to RCW
4.24.010,

11

                Plaintiff,

12

        vs.

13
14
15
16
17

THE CITY OF YAKIMA,
WASHINGTON; MARK
McKINNEY, in his official capacity
as well as individually, and, if
applicable, JANE McKINNEY, and
the marital community composed
thereof; and JOHN and/or JANE
DOES I-X,

18

                Defendants.

NO.  CV-04-3100-RHW

**ORDER GRANTING
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT, *INTER
ALIA***

19
20
21
22
23
24
25
26
27
28

        Before the Court are Defendants' Motion for Summary Judgment (Ct. Rec.
16); Defendants' Motion to File Joint Brief in Support of their Motion for
Summary Judgment in Excess of 20 Pages (Ct. Rec. 21); Defendants' Motion to
Expedite Motion to File Overlength Summary Judgment Reply Brief (Ct. Rec. 29);
Defendants' Motion for Leave to File Excess Pages of Joint Reply Brief in Support
of their Motion for Summary Judgment (Ct. Rec. 30); and Defendants' Motion to
Strike Plaintiff's Evidentiary Submissions and Objections (Ct. Rec. 35).  A hearing
was held on January 11, 2006.  Heidi Hunt appeared on behalf of Plaintiff Shirley
Bartsch; Helen Harvey and Robert Tenney appeared on behalf of Defendant City

of Yakima.  Robert Christie appeared on behalf of Defendants Mark and Jane McKinney.

### BACKGROUND

Plaintiff Shirley Bartsch is suing the City of Yakima and Mark McKinney, a police officer employed by the City of Yakima, as the parent and administrator of the estate of Elvis Wayne Wilson.  Mr. Wilson was killed by Defendant McKinney from a single shotgun wound to the chest after Wilson charged McKinney with a knife.  Plaintiff alleges causes of action under 42 U.S.C. § 1983, and she requests punitive and exemplary damages pursuant to RCW §§ 4.22.070(1)(a), (b), & 9.73.230.  Plaintiff also requests reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988 and RCW § 9.73.060.  Defendants raised multiple affirmative defenses in their answers, and they now request summary judgment in their favor.

### STANDARD OF REVIEW

Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  When considering a motion for summary judgment, a court may neither weigh the evidence nor assess credibility; instead, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

An official seeking immunity bears the burden of demonstrating that immunity attaches to a particular function.  *Burns v. Reed*, 500 U.S. 478, 486 (1991).  When the non-moving party has the burden of proof at trial, the party moving for summary judgment need only point out that there is no evidence to support the non-moving party's case in order to meet the burden of demonstrating the absence of a genuine issue of material fact.  *See Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001).

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT * 2

1

**FACTS**

2       The following facts are not disputed unless otherwise indicated:

3       On August 11, 2003, Deputy Sergeant (Sgt.) George Town with the Yakima

4   County Sheriff's Office was leading an investigation into an incident involving

5   decedent Mr. Wilson.  Mr. Wilson allegedly inflicted a gun shot wound to his

6   uncle's hand during an altercation.  Defendant asserts, but Plaintiff disputes, that

7   Sgt. Town was in charge of the scene and the intended arrest of Mr. Wilson.  Sgt.

8   Town did not have a warrant for his arrest, but it appears from the record that he

9   did have probable cause to arrest him.  Plaintiff asserts Sgt. Town and the other

10  officers knew, or should have known, that Mr. Wilson had been drinking, was

11  "cranked up," and was not on his mental health medications.

12      Accompanied by Sheriff's Deputy Briscoe, Sgt. Town arrived at 1514 South

13  9th Avenue in Yakima, the residence where Mr. Wilson was reportedly located.

14  Deputy Briscoe contacted dispatch and requested the Yakima Police respond to

15  assist as backup.  Officer McKinney and Officer Morkert, both from the Yakima

16  City Police Department, responded to the location to provide backup assistance.

17  After receiving a brief update on the situation, the officers and deputies initiated

18  contact with Mr. Wilson.  Sgt. Town walked toward the house.  Officer Morkert

19  recommended to Officer McKinney that the two of them take their "long arms"

20  (McKinney's 12-gauge shotgun and Morkert's AR15 rifle) to back up the deputies.

21  There were two dogs in the yard which Defendants characterize as "seemingly

22  aggressive," but Plaintiff disputes this characterization.  Sgt. Town walked past the

23  dogs without incident.

24      Mr. Wilson, who was speaking on a cordless phone, answered the door and

25  spoke to Sgt. Town before they both entered the house.  The door behind them was

26  shutting or actually closed, and this prompted the other officers and deputy on the

27  scene to follow Sgt. Town into the house.  Plaintiff argues that the other officers

28  did not have consent to enter the residence; Defendant states they entered in the

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT * 3

interest of officer safety.  After the additional officers entered the house, Mr. Wilson asked them to leave, and he and all the officers went into the yard.  Sgt. Town decided not to take Mr. Wilson into custody while the officers were all in the house, instead allowing him to exit the residence.

Once outside, Mr. Wilson attempted to calm the dogs, but told them not to attack the officers "yet."  Officer McKinney unslung his shotgun and pointed it upwards in case the dogs did attack.  Plaintiff alleges that Officer McKinney brandished his shotgun in such a way as to cause Mr. Wilson to believe a gun was being pulled on him.  Defendant states Sgt. Town at this time was attempting to calm Mr. Wilson down.  Mr. Wilson became increasingly agitated, and eventually pulled out a knife after accusing Officer McKinney of pointing or pulling a gun on him.  The knife was approximately four inches in length.  In response to Mr. Wilson's arming himself with a knife, Officer McKinney chambered a round, lowered his shotgun at Mr. Wilson, and yelled at him to drop the knife.  Officer Morkert acted similarly.  Officer Morkert called for less lethal backup over his radio.

Either before (Plaintiff's contention) or after (Defendant's contention) Mr. Wilson pulled out his knife, he began yelling at the officers to "shoot me!"  He continued to yell this throughout their encounter.  Officer Morkert attempted to pepper spray Mr. Wilson, but he was too far away for the pepper spray to be effective.  Sgt. Town, who was closer to Mr. Wilson, took the pepper spray and effectively sprayed Mr. Wilson, who became more agitated.

At some point, Mr. Wilson became aware of and focused on Officer Bennett. Bennett had arrived as backup, was pointing his gun at Mr. Wilson, and was located outside the fenced yard of the house.  Holding the knife in a throwing position over his head, Mr. Wilson approached the fence and Officer Bennett.

Mr. Wilson backed off and again approached the officers inside the fenced yard.  Officer McKinney placed his finger on the trigger in the event he was going

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT * 4

to have to shoot Mr. Wilson, but Mr. Wilson stopped his approach approximately seven feet away and again backed off.

At this point, Sgt. Town pepper sprayed Mr. Wilson again with foam spray. Mr. Wilson retreated briefly and then charged the officers (Plaintiff disputes this characterization, saying that he walked at a fast pace). Mr. Wilson moved the knife into an overhead attack position and became very irritated. Officer McKinney backed up, keeping his eyes on Mr. Wilson, until he felt the concrete walkway behind him and stopped for fear of tripping. At a range of four feet, according to Defendants, Officer McKinney fired a single shot into Mr. Wilson's chest. Plaintiff disputes the range, but offers no contradictory evidence.

Officer McKinney immediately chambered another round, but he did not fire again. Mr. Wilson stopped his advance, staggered back, and fell to the ground. Medical personnel later arrived at the scene but determined that the single shot was a fatal wound for which medical care was of no value.

Officer McKinney's patrol car was equipped with a fixed video camera which he activated sometime after Mr. Wilson pulled out the knife. Although the video was fixed and does not reveal what occurred, the audio recording was transcribed. It indicates that multiple officers repeatedly directed Mr. Wilson to "put down the knife" and to "drop the knife," and that they also repeatedly stated "we just want the knife."

### DISCUSSION

Before the Court are Defendants' Motion for Summary Judgment (Ct. Rec. 16) and related motions. Defendants argue summary judgment is appropriate for Plaintiff's claims under § 1983 because (1) Defendant McKinney's use of deadly force against Mr. Wilson was permissible under the Fourth Amendment; (2) McKinney's actions were objectively reasonable and fall within the scope of qualified immunity for § 1983 claims; and (3) Plaintiff cannot establish that the "moving force" behind McKinney's actions was an unconstitutional policy or

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT * 5

custom officially adopted or promulgated by the City of Yakima ("Yakima").

### A. Permissible Force under the Fourth Amendment

The Supreme Court articulated the test for determining whether the use of deadly force is reasonable under the Fourth Amendment in *Tennessee v. Garner*, 471 U.S. 1, 11-12 (1985). After recognizing that apprehension by use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment, *id*. at 7, the Court held:

> Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force. Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given.

*Id*. at 11-12.

To determine whether a particular use of force was reasonable, the Supreme Court has directed that lower courts apply the objective reasonableness standard. *Graham v. Connor*, 490 U.S. 386, 388 (1989). Courts must balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake[.]" *Id*. at 396. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id*. Consequently, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id*. at 396-97.

Here, Officer McKinney was certainly operating in circumstances that were tense, uncertain, and rapidly evolving. A reasonable officer being approached by a man wielding a knife over his head, in the attack position, would reasonably feel threatened and that the use of even deadly force was necessary to protect his safety

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT * 6

and the safety of others.  Indeed, the facts show that Officer McKinney withheld his fire on at least one earlier occasion when he might reasonably have pulled the trigger.  The circumstances show, even when viewed in a light most favorable to Plaintiff, that Mr. Wilson was actively resisting arrest and was the aggressor when Officer McKinney shot him.  Mr. Wilson posed an imminent threat of injury or death.  Because a reasonable officer would perceive a substantial risk that Mr. Wilson would seriously injure or kill him with his knife, the Fourth Amendment seizure was objectively reasonable.[1]  *See Billington v. Smith*, 292 F.3d 1177, 1185 (9th Cir. 2002) (finding no violation of constitutional rights when an officer shot and killed the decedent after engaging in hand-to-hand combat with him).

Plaintiff puts forth several "what if" scenarios to argue that Officer McKinney's actions were not reasonable under the Fourth Amendment.  Initially, she points out that the seizure was deadly, the officers did not act pursuant to a warrant, six to ten police officers were present at the scene at the time Mr. Wilson was shot, and Mr. Wilson was intoxicated and emotionally disturbed.  Plaintiff also argues that Officer McKinney did not consider alternatives to deadly force such as retreating, shielding himself behind a car, employing less lethal alternatives, or employing the services of a negotiator.  Plaintiff further asserts that the officers had plenty of opportunity to plan the arrest before approaching the residence where Mr. Wilson was located.  Plaintiff stresses that the officers did not give any verbal warnings to Mr. Wilson that he would be killed if he came too close to an officer.  Lastly, Plaintiff maintains that Officer McKinney committed independent Fourth Amendment violations leading up to the shooting that created the necessity of the use of deadly force.  Plaintiffs do not offer any evidence from an expert in police

---

[1]  During the January 11, 2006, hearing, Plaintiff conceded that the use of deadly force was reasonable.  She focused argument on the officers' actions leading up to the use of deadly force.

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT * 7

1  tactics to support their claims.  *See Billington*, 292 F.3d at 1186-87 (describing

2  expert evidence offered by plaintiff claiming that officer made tactical errors which

3  created the situation in which he was forced to shoot decedent, citing and

4  describing two similar Tenth Circuit cases).

5                    **i.    Tactical Errors and Independent Constitutional Violations**

6           In *Billington v. Smith*, the Ninth Circuit considered whether it was

7  appropriate to consider tactical decisions leading up to a use of force when

8  determining whether a constitutional violation occurred.  *Id.* at 1187-91.  After

9  examining several precedential decisions, the court found that "[o]ur precedents do

10  not forbid *any* consideration of events leading up to a shooting.  But neither do

11  they permit a plaintiff to establish a Fourth Amendment violation based merely on

12  bad tactics that result in a deadly confrontation that could have been avoided." *Id.*

13  at 1190 (emphasis in original).  The court conducted a complex analysis,

14  recognizing that it must consider both the constitutionality of the officer's

15  preceding conduct and the harms the constitutional violation proximately caused.

16  *Id*.

17           When determining whether the initial conduct was constitutional, the Ninth

18  Circuit dictated that courts apply the same objective reasonableness test outlined

19  above, "from the perspective of a reasonable officer on the scene." *Id*.  Once the

20  district court has determined the constitutionality of the officer's initial conduct,

21  then it must consider the scope of liability.  *Id*.  The Ninth Circuit explained that

22  "even if an officer negligently *provokes* a violent response, that negligent act will

23  not transform an otherwise reasonable subsequent use of force into a Fourth

24  Amendment violation." *Id*. (emphasis in original).  This is because the Fourth

25  Amendment's reasonableness standard is not the same as the standard of

26  reasonable care under tort law, "and negligent acts do not incur constitutional

27  liability." *Id*.  However, if

28           an officer intentionally or recklessly provokes a violent response, and the

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT * 8

provocation is an independent constitutional violation, that provocation may render the officer's otherwise *reasonable* defensive use of force *unreasonable* as a matter of law. In such a case, the officer's initial unconstitutional provocation, which arises from intentional or reckless conduct rather than mere negligence, would proximately cause the subsequent application of deadly force.

*Id*. at 1190-91 (emphasis in original).

In the case at bar, Plaintiff has not established that Officer McKinney intentionally or recklessly provoked Mr. Wilson's attack, much less that he committed an independent Fourth Amendment violation that provoked it. Plaintiff's tactical complaints, that McKinney should have used less lethal defensive tactics, taken more time to plan, retreated, or used a negotiator, all "fit the '20/20 vision of hindsight' category *Graham v. Connor* holds must be disregarded." *Billington*, 292 F.3d at 1191 (internal citation omitted). Additionally, even assuming a jury could conclude Officer McKinney should have done these things, none of these errors could be deemed intentional or reckless provocations. *Id*.

The alleged constitutional violations likewise do not rise to the necessary level. Plaintiff avers Officer McKinney's entrance into Mr. Wilson's house without a warrant or consent and his "brandishing" of his shotgun violated the constitution. However, Defendant presents evidence that shows he was behaving in an objectively reasonable manner when he engaged in these activities. McKinney entered the house in the interest of Sgt. Town's safety, and could have reasonably believed Mr. Wilson consented to his entrance in addition to that of Sgt. Town. Unslinging his shotgun in the presence of two potentially aggressive dogs also is objectively reasonable behavior. Like the alleged tactical errors outlined above, Officer McKinney's actions could not "be deemed intentional or reckless, much less unconstitutional, provocations that caused [Mr. Wilson] to attack him." *Id*.

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT * 9

### ii.    Mr. Wilson's Mental State and Failure to Warn

Plaintiff cites to *Deorle v. Rutherford*, 272 F.3d 1272 (9th Cir. 2001), for two propositions: (1) that the officers should have taken Mr. Wilson's mental state into greater consideration and this should have prompted them to use negotiators; and (2) that police should have explicitly warned Mr. Wilson that he would be shot if he did not drop his knife.  The plaintiff in *Deorle* was seriously injured from bean-bag ammunition shot at his face.  *Id*. at 1278.  The officer shot the plaintiff after he had been on the scene for about forty minutes, and the officer knew the plaintiff was mentally disturbed.  *Id*. at 1277.  The officer had also observed the plaintiff comply with demands to drop potentially threatening items, such as an unloaded crossbow and a hatchet.  *Id*. at 1276-77.  The *Deorle* plaintiff was verbally abusive, but physically compliant.  *Id*.  The officer shot him without warning as the plaintiff walked toward him with no weapons in hand and with a steady gait.  *Id*. at 1277-78.

The Ninth Circuit found that the officer's actions were constitutionally unreasonable.  *Id*. at 1285.  In coming to this decision, the court considered several factors, including notably the emotional state of the plaintiff and the lack of warnings.  *Id*. at 1282-84.  Regarding suspects who are mentally disabled or emotionally disturbed, the court explained:

> [e]ven when an emotionally disturbed individual is "acting out" and inviting officers to use deadly force to subdue him, the governmental interest in using such force is diminished by the fact that the officers are confronted, not with a person who has committed a serious crime against others, but with a mentally ill individual.  We do not adopt a per se rule establishing two different classifications of suspects: mentally disabled persons and serious criminals.  Instead, we emphasize that where it is or should be apparent to the officers that the individual involved is emotionally disturbed, that is a factor that must be considered in determining, under *Graham*, the reasonableness of the force employed.

*Id*. at 1283.

First, *Deorle* is distinguishable from the case at hand.  Here, Mr. Wilson was armed and not obeying officer requests to drop his knife, and he had committed a

1    serious crime against another person earlier in the day.  Second, the Ninth Circuit

2    qualified the *Deorle* holding in *Blanford v. Sacramento County*, 406 F.3d 1110,

3    1117 (9th Cir. 2005).  In that case, a man was reported to be walking down the

4    street holding a sword.  Officers responded to the scene and they repeatedly yelled

5    at the man to drop the sword or they would shoot.  The man continued walking

6    down the street, growled aggressively at one point, and turned into a residence.  *Id.*

7    at 1112-13.  Neither officer wanted the man to enter the residence or its yard for

8    fear of the occupants' safety.  *Id.* at 1113.  It was later discovered that the man was

9    wearing headphones turned up loud, had just taken anti-psychotic medicine, and

10   resided at the house he was attempting to enter.  *Id.* at 1112-14.  Before learning

11   these details, the officers shot several volleys at the man, the last of which severed

12   his spine leaving him paralyzed.  *Id.* at 1113-14.

13        The *Blanford* court found the deputies' behavior to be objectively reasonable

14   under the Fourth Amendment.  *Id.* at 1119.  In doing so, they considered the

15   *Deorle* holding, and stated that the "deputies did factor the possibility of [the

16   suspect's] being mentally disturbed into their thinking as they should have, but [the

17   suspect] was armed with a dangerous weapon and it was not objectively

18   unreasonable for them to consider that securing the sword was a priority."  *Id.* at

19   1117.  Here, as in *Blanford*, Officer McKinney behaved in an objectively

20   reasonable manner.  In spite of Mr. Wilson's emotional state and his later-

21   discovered level of intoxication,[2] Officer McKinney's primary concern was for his

22   safety and the safety of others, and securing either the knife or their safety was a

23   top priority.

24        *Deorle* also considered the absence of warnings.  "The absence of a warning

25   or an order to halt is also a factor that influences our decision."  *Deorle*, 272 F.3d

26

27        [2]  Toxicology tests reflected a blood alcohol level of .26 percent at the time

28   of death, which is about three times the legal limit.

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT * 11

at 1283-84.  The Ninth Circuit did not create a rule requiring warnings whenever less than deadly force is used, but rather determined that such warnings "should be given, when feasible, if the use of force may result in serious injury[.]" *Id.* at 1284. Plaintiff relies on this and other language from *Deorle* for the proposition that comprehensive warnings, including ". . . or I'll shoot," are required when deadly force is employed.

The undisputed facts show that several officers on the scene told Mr. Wilson repeatedly to drop the knife.  None of the officers apparently told Mr. Wilson he would be shot if he did not drop the knife.  Mr. Wilson also repeatedly told the officers to shoot him or kill him.  There is no Ninth Circuit case law addressing the question of what comprises an adequate warning, *i.e.*, whether "drop the knife" is enough, or whether an appropriate warning must also include "or I'll shoot." However, considering Mr. Wilson's comments to the officers to shoot him, it is objectively reasonable that the officers did not offer to shoot him if he did not drop the knife.  Mr. Wilson did receive warning.  He was being tracked by two long arms while being told to drop his knife.  Additionally, a warning is only required when feasible, *Deorle*, 272 F.3d at 1284, and an additional warning during Mr. Wilson's sudden, final charge would not have been feasible.

Accordingly, Officer McKinney's use of deadly force, although incredibly unfortunate for all those involved in the situation, was objectively reasonable under the Fourth Amendment.  As the Ninth Circuit has stated, the "law does not condemn citizens to death any time they resist arrest.  Just as some decedents in police shooting cases appear to commit 'suicide by cop,' it is conceivable that some police officers could commit 'homicide by self-defense' by unconstitutionally and intentionally provoking an attack so that they could respond to it with deadly force." *Blanford*, 292 F.3d at 1191.  Such was not the case here. Officer McKinney did not provoke Mr. Wilson's attack, and the ten minutes or so in which this situation developed is not ample time to consider alternative tactics.

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT * 12

**B.    Qualified Immunity**

Because Officer McKinney's actions were constitutionally reasonable, the question of whether Officer McKinney had qualified immunity does not necessarily need to be reached.  However, assuming Officer McKinney did violate Mr. Wilson's rights, he would still be entitled to qualified immunity.  It is well established that police officers are entitled to qualified immunity to shield them "from liability from civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

In determining whether Officer McKinney has qualified immunity, the Court must first determine whether Plaintiff has stated a *prima facie* claim that he violated one of Mr. Wilson's constitutional rights.  *Saucier v. Katz*, 533 U.S. 194, 198 (2001).  If the Court determines that Plaintiff presented a *prima facie* case, it must ascertain whether the right allegedly violated was clearly established by federal law.  *Id.*  Finally, the Court must determine whether a reasonable officer would have known that his conduct violated the law.  *Id.*  If the status of the right is unclear or unsettled, qualified immunity is appropriate.  *Elder v. Holloway*, 510 U.S. 510, 515 (1994).

The first issue the Court must determine is whether Plaintiff has alleged the deprivation of a federally-protected statutory or constitutional right.  *Conn v. Gabbert*, 526 U.S. 286, 290 (1999).  Assuming she has accomplished this, the Court must next determine whether Officer McKinney's use of force

> was premised on a *reasonable* belief that such force was lawful, or, as the Supreme Court recently put it: 'whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'    The Court also explained the purpose of the rule: '[q]ualified immunity operates . . . to protect officers from the sometimes hazy border between excessive and acceptable force.'

*Deorle*, 272 F.3d at 1285 (quoting *Saucier*, 533 U.S. at 2156, 2158) (alterations and emphasis in original, internal citation omitted).

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT * 13

1   Even if the Court has misjudged the constitutional issue here, neither

2   Supreme Court nor circuit precedent in existence as of August 11, 2003 would

3   have put a reasonable officer in Officer McKinney's position on notice that using

4   deadly force in those particular circumstances would violate Mr. Wilson's Fourth

5   Amendment rights.  *See Blanford*, 406 F.3d at 1119.  Officer McKinney had

6   probable cause to believe that Mr. Wilson posed a threat of serious physical harm

7   to himself and others, and his use of deadly force was premised on a reasonable

8   belief that his conduct was lawful in the circumstances.

9       **C.    Municipal Policy or Custom**

10      Again because Officer McKinney's actions were constitutionally reasonable,

11  the question of whether his use of deadly force creates municipal liability does not

12  necessarily need to be reached.  However, assuming Officer McKinney did violate

13  Mr. Wilson's Fourth Amendment rights, the City of Yakima is still immune from §

14  1983 liability.

15      The Supreme Court in *Monell v. New York City Dep't of Social Servs.*, 436

16  U.S. 658, 689-90 (1978), and later cases held that municipalities and other local

17  governmental bodies are "persons" and thus may be held liable under § 1983.  The

18  Court also examined the legislative history of § 1983, and determined that a

19  municipality may not be held liable under § 1983 "*solely* because it employs a

20  tortfeasor—or, in other words, a municipality cannot be held liable under § 1983

21  on a *respondeat superior* theory."  *Id*. at 691 (emphasis in original).  Liability will

22  be imposed on a government that "under color of some official policy, 'causes' an

23  employee to violate another's constitutional rights."  *Id*. at 692.

24      The Court has refined this holding through later cases addressing the issue of

25  municipal liability under § 1983.  In 1986, the Court held that "municipal liability

26  under § 1983 attaches where—and only where—a deliberate choice to follow a

27  course of action is made from among various alternatives by the official or officials

28  responsible for establishing final policy with respect to the subject matter in

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT * 14

question." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986).  More

recently, the Court explained its reasoning further:

> [I]n *Monell* and subsequent cases, we have required a plaintiff seeking to impose liability on a municipality under § 1983 to identify a municipal "policy" or "custom" that caused the plaintiff's injury.  Locating a "policy" ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality.  Similarly, an act performed pursuant to a "custom" that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law.
> . . .
> [I]t is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality.  The plaintiff must also demonstrate that, through its *deliberate* conduct, the municipality was the "moving force" behind the injury alleged.  That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.

*Bd. of County Comm'rs of Bryan County, Okla. v. Brown*, 520 U.S. 397, 403-04

(1997) (emphasis in original) (internal citations omitted).

Therefore, Plaintiff must establish that the City had a relevant and deliberate

policy or custom and that this policy or custom was the proximate cause of her

injuries.  Plaintiff asserts that the City of Yakima's failure to train its police

officers was a deliberate or conscious choice by the municipality and thus

amounted to deliberate indifference to the rights of persons with whom the police

come into contact.  *City of Canton v. Harris*, 489 U.S. 378, 388-89 (1989).  The

areas in which Plaintiff avers the City's training policy was inadequate include the

legal limits of the use of force, defensive tactics, and warrantless entry into a

dwelling.

In *Harris*, the Supreme Court recognized that a municipality may be liable

under § 1983 for failure to adequately train its police officers, but "[o]nly where a

municipality's failure to train its employees in a relevant respect evidences a

'deliberate indifference' to the rights of its inhabitants[.]" *Id.* at 389.  To prove a

municipality is liable under § 1983 for its failure to train, "the focus must be on

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT * 15

1 adequacy of the training program in relation to the tasks the particular officers
2 must perform.  That a particular officer may be unsatisfactorily trained will not
3 alone suffice to fasten liability on the city, for the officer's shortcomings may have
4 resulted from factors other than a faulty training program." *Id*. at 390-91.
5 Moreover, for liability to attach to a municipality in a failure to train claim, "the
6 identified deficiency in a city's training program must be closely related to the
7 ultimate injury." *Id*. at 391.
8      In the case at hand, Plaintiff states three areas of training deficiencies.
9 Plaintiff relies on the Yakima Police Department Policy and Procedure Manual to
10 show that the City did not have adequate procedures instructing its officers to warn
11 suspects before using deadly force.  The Manual provides that:

> An employee may discharge a firearm for any of the following reasons:
> (a) When the officer reasonably believes that deadly force is <u>necessary</u> to prevent imminent death or serious bodily harm to himself or another person.
> (b) When <u>necessary</u> to arrest or apprehend a person whom the employee reasonably believes has committed, has attempted to commit, or is attempting to commit a felony.

16 (emphasis in original).  This appears to be an accurate description of the reasons an
17 officer may use deadly force under both state and federal law.  *See Garner*, 471
18 U.S. at 11-12; RCW § 9A.16.040 (describing the reasons officers may use deadly
19 force in the state of Washington).  Although this procedure does not discuss
20 warnings, the City contends that warnings and other aspects of the "method and
21 manner" of using deadly force come from police academy and in-service training.
22      Plaintiff's training claims focusing on warnings and on warrantless entries
23 into dwellings are both deficient in that they are not closely related to the ultimate
24 injury.  However, Plaintiff's third claim for lack of training in less lethal defensive
25 tactics is more closely related to Mr. Wilson's death. This claim and Plaintiff's
26 other claims also fail to create municipal liability because she has not shown that
27 they result from a "program" under *Canton*.  The Supreme Court elaborated on its
28 *Canton* holding in *Brown*, describing the requirements to demonstrate a program

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT * 16

1   exists:

> We concluded in *Canton* that an "inadequate training" claim could be the
> basis for § 1983 liability in "limited circumstances."   We spoke,
> however, of a deficient training "program," necessarily intended to apply
> over time to multiple employees. Existence of a "program" makes proof
> of fault and causation at least possible in an inadequate training case. If
> a program does not prevent constitutional violations, municipal
> decisionmakers may eventually be put on notice that a new program is
> called for.  Their continued adherence to an approach that they know or
> should know has failed to prevent tortious conduct by employees may
> establish the conscious disregard for the consequences of their action-the
> "deliberate indifference"—necessary to trigger municipal liability.  In
> addition, the existence of a pattern of tortious conduct by inadequately
> trained employees may tend to show that the lack of proper training,
> rather than a one-time negligent administration of the program or factors
> peculiar to the officer involved in a particular incident, is the "moving
> force" behind the plaintiff's injury.

520 U.S. at 407-408 (internal citations omitted).

In the case at hand, Plaintiff has failed to show that a "program" with inadequate training in less lethal defensive tactics exists—one that applies over time to multiple employees.  Nor has Plaintiff demonstrated that a "program" with inadequate training in giving warnings and warrantless entry of dwellings exists. In fact, Defendants have produced uncontroverted evidence that Mr. Wilson's death was the first use of deadly force by a Yakima police officer since 1975. Hence, there is no genuine issue of material fact as to whether the City of Yakima may be held liable as a municipality under § 1983 in this case, and summary judgment is appropriate.

Accordingly, **IT IS HEREBY ORDERED:**

1.   Defendants' Motion for Summary Judgment (Ct. Rec. 16) is **GRANTED**.

2.   Defendants' Motion to File Joint Brief in Support of their Motion for Summary Judgment in Excess of 20 Pages (Ct. Rec. 21) is **GRANTED**.

3.   Defendants' Motion to Expedite Motion to File Overlength Summary Judgment Reply Brief (Ct. Rec. 29) is **DENIED as moot**.

4.   Defendants' Motion for Leave to File Excess Pages of Joint Reply Brief

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT * 17

in Support of their Motion for Summary Judgment (Ct. Rec. 30) is **GRANTED**.

  5. Defendants' Motion to Strike Plaintiff's Evidentiary Submissions and Objections (Ct. Rec. 35) is **DENIED as moot**.

  6. Defendants' Motion *in Limine* (Ct. Rec. 45) is **DENIED as moot**.

  7. Defendants' Motion to Expedite Time on Their Motion to File Overlength Motion *in Limine* Brief (Ct. Rec. 46) is **DENIED as moot**.

  8. Defendants' Motion for Leave to File Excess Pages (Ct. Rec. 48) is **DENIED as moot**.

  **IT IS SO ORDERED.** The District Court Executive is hereby directed to enter this order and to furnish copies to counsel and **close the file**.

  **DATED** this 23rd day of January, 2006.


          s/Robert H. Whaley
         ROBERT H. WHALEY
        Chief United States District Judge


Q:\CIVIL\2004\Bartsch\Bartsch.sj.ord.wpd

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT * 18